**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HAROLD LISCHNER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UPPER DARBY TOWNSHIP and** | : | |
| **MICHAEL KEHRLE,** | : | |
| **Defendants** | : | **NO. 05-4546** |

<u>**MEMORANDUM AND ORDER**</u>

PRATTER, J.                                                        FEBRUARY 5, 2007

        Dr. Harold Lischner sued Upper Darby Township and Police Officer Michael Kehrle

(collectively, "Defendants") pursuant to 42 U.S.C. § 1983, alleging Officer Kehrle arrested him

in contravention of state law and the federal Constitution.  Specifically, Dr. Lischner asserts that

(1) his 2003 arrest violated his rights under the Fourth and Fourteenth Amendments to the

Constitution; (2) Upper Darby proximately caused this violation of his rights because it failed to

properly train and supervise its law enforcement officers with respect to the legal cause required

to effect an arrest and the rights of citizens to engage in political expression; and (3) the

Defendants are liable to Dr. Lischner for the torts of false arrest and false imprisonment.[1]

        The Defendants moved for summary judgment on all counts on behalf of both Officer

---

[1] Dr. Lischner voluntarily dismisses his First Amendment and invasion of privacy claims
against Officer Kehrle.  Dr. Lischner also concedes that Pennsylvania law currently does not
provide a damages remedy for violations of the Pennsylvania Constitution, <u>Jones v. City of
Philadelphia</u>, 890 A.2d 1188, 1208 (Pa. Commw. Ct. 2006); <u>Klump v. Nazareth Area Sch. Dist.</u>,
425 F. Supp. 2d 622, 641-42 (E.D. Pa. 2006), but, expressly acknowledging that he prefers to
preserve his claims in the event that the Pennsylvania Supreme Court should permit such causes
of action in the future, he leaves to this Court the dismissal of those claims because they do not
now state a cause of action upon which relief can be granted.

Kehrle and Upper Darby.  Dr. Lischner opposes the motion with respect to his claim against

Upper Darby, and moved for partial summary judgment as to his claims against Officer Kehrle.

For the reasons discussed more fully below, the Defendants' Motion for Summary Judgment is

granted in part and denied in part, and Dr. Lischner's Motion for Partial Summary Judgment is

denied.

**BACKGROUND**

On September 15, 2003, local supporters of President George W. Bush held an event at

the Drexelbrook Catering Facility, located within a privately owned residential community

known as "Drexelbrook."  The event was described as an occasion for the President to thank and

speak to supporters.  It was a private, i.e., by invitation, event.  Drexelbrook has been owned by

Drexelbrook Associates since 1959.  Although Drexelbrook Associates has never dedicated its

property to public use, various portions of it are open to public, including commercial businesses

located on the premises.  The Catering Facility is available for rental for events such as banquets,

weddings, and the like.  Drexelbrook did not extend any formal invitation to the general public

for the President's event but it designated an outdoor space on its property for members of the

public to gather to observe the arrival of the President's motorcade, and permitted the public to

enter onto its property for this public prelude to the private event.  Prior to the event, however,

Drexelbrook Associates instructed the Upper Darby Police Department that neither protesting nor

the displaying of signs would be permitted on its property.  An area along the route of the

President's motorcade on the public sidewalk outside of Drexelbrook was designated for

demonstrators and protestors.

After receiving permission from an auxiliary police officer,[2] Dr. Harold Lischner, then 78 years old, joined a group of approximately 50 members of the public gathered along the driveway on Drexelbrook property in anticipation of the President's motorcade.  Dr. Lischner then placed a torso-sized sign on the front of his chest with a message that stated: "Withdraw our troops from Iraq.  Give the $87 billion to the Iraqi governing council and UN for immediate relief and repair of the destruction we caused."[3]  Upon learning of Dr. Lischner's sign, Officer Kehrle informed Dr. Lischner that no signs or demonstrators were permitted, and if Dr. Lischner did not remove the sign, he would have to leave the premises.  Dr. Lischner refused to remove the message, responding that he had a right to display it.  There is no evidence that Dr. Lischner sought to wave, vocalize or otherwise engage in anything other than this passive presentation of his position.  Officer Kehrle repeated his request several times for Dr. Lischner to remove the sign, but Dr. Lischner continued to display it.  Drexelbrook Associates's private security personnel then asked Dr. Lischner to leave the property.  When Dr. Lischner refused to comply, Officer Kehrle placed him under arrest for "Defiant Trespass," 18 Pa. C.S. § 3503.  Dr. Lischner was handcuffed and taken to the Upper Darby Police Department headquarters.

Officer Kehrle actually charged Dr. Lischner with "Disorderly Conduct" instead of "Defiant Trespass."  Subsequently, Dr. Lischner was released from custody and, after receiving a summons, posted bond and pleaded not guilty to the charges.  On November 18, 2003, Dr.

---

[2] Auxiliary police officers are volunteers who assist the Upper Darby Police Department with crowd control.  They do not have arrest powers.

[3] The Court notes the possible ambiguity of the chest-sized sign with respect to Dr. Lischner's own political affiliation insofar as his message merely promoted an alternative policy in and about Iraq other than as currently pursued.  The text of the sign states nothing about the President himself or the upcoming election.  Dr. Lischner displayed no political party affiliation.

3

Lischner was found not guilty of "Disorderly Conduct."  This suit followed.

**DISCUSSION**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the Court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," id. at 325, or by offering affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v. Nat'l Westminister Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996).  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the Court must draw all reasonable and justifiable inferences in the nonmovant's favor.  Anderson, 477 U.S. at 255.  However, a nonmoving plaintiff cannot defeat a motion for summary judgment by merely

restating the allegations of the complaint, but instead must "point to concrete evidence in the record that supports each and every essential element in his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322).

### A.    Fourth and Fourteenth Amendment Claims Against Officer Kehrle

To succeed in a Section 1983 action, a claimant must prove that a person acting under color of state law violated the claimant's constitutional rights. Robb v. City of Philadelphia, 733 F.2d 286, 290-91 (3d Cir. 1984). Dr. Lischner contends that his arrest and detention by Officer Kehrle were without probable cause and, therefore, in violation of the Fourth Amendment. An arrest may violate the standards of the Fourth Amendment if it is made without probable cause to believe that a crime has been committed. Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994). Thus, the proper inquiry in a Section 1983 claim based on false arrest is "'whether the arresting officers had probable cause to believe the person arrested had committed the offense.'" Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). If the arresting officer lacked probable cause to make the arrest, the arrestee also has a claim under section 1983 for "false imprisonment based on a detention pursuant to that arrest." Id. at 636 (citing Thomas v. Kippermann, 846 F.2d 1009, 1011 (5th Cir. 1988)).

### 1.    Probable Cause to Arrest

Typically, the existence of probable cause in a Section 1983 action is a question of fact. Wilson v. Russo, 212 F.3d 781, 796 (3d Cir. 2000) (citing Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)); Groman, 47 F.3d at 635. A court, however, can conclude that probable cause did not exist as a matter of law if the evidence viewed in the light most favorable to the non-moving party would not reasonably support a finding of probable cause. See Sherwood, 113

5

F.3d at 401.  It is the Court's role to determine whether the objective facts available to the police

officer at the time of the arrest would justify a reasonable belief that an offense was being

committed.  Victory Outreach Ctr. v. Melso, 313 F. Supp. 2d 481, 488 (E.D. Pa. 2004) (citing

Johnson v. Campbell,332 F.3d 199, 211 (3d Cir. 2003)).  Thus, the Court must examine whether

any facts in the record reasonably support a finding of probable cause.

        "Probable cause to arrest exists when the facts and circumstances within the arresting

officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an

offense has been or is being committed by the person to be arrested."  Merkle v. Upper Dublin

Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000) (citing Orsatti v. New Jersey State Police, 71 F.3d

480, 482 (3d Cir. 1995)).[4]  Thus, "the probable cause standard does not turn on the actual guilt or

innocence of the arrestee, but rather, whether the arresting officer reasonably believed that the

arrestee had committed the crime."  Radich v. Goode, 886 F.2d 1391, 1397 (3d Cir. 1989); see

also Barna, 42 F.3d at 819 ("The test for an arrest without probable cause is an objective one,

based on the facts available to the officers at the moment of arrest.").[5]  Probable cause "is a fluid

concept – turning on the assessment of probabilities in particular factual context – not readily, or

even usually, reduced to a neat set of legal rules."  Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir.

_____

        [4] "The validity of an arrest is determined by the law of the state where the arrest
occurred."  United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Ker v. California,
374 U.S. 23, 37 (1963)).

        [5] The parties do not dispute, and the Court agrees, that it is irrelevant to the probable
cause analysis that Officer Kehrle ultimately did not charge Dr. Lischner with defiant trespass.
See Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (concluding that "[i]t is
irrelevant to the probable cause analysis what crime a suspect is eventually charged with");
Barna, 42 F.3d at 819 (holding that an arrest is lawful if there is probable cause for "any offense
that could be charged under the circumstances").

1999) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Thus, courts must take a "common

sense" approach to the issue of probable cause and "a determination of its existence must be

based on the totality of the circumstances."  Id. (quoting Sharrar v. Felsing, 128 F.3d 810, 818

(3d Cir. 1997)).

The Defendants contend that Officer Kehrle had probable cause to arrest Dr. Lischner for

defiant trespass.  The Pennsylvania Criminal Code defining the crime of defiant trespass, 18 Pa.

C.S. § 3503(b), provides in relevant part:

> (1) A person commits an offense if, knowing that he is not licensed
> or privileged to do so, he enters or remains in any place as to which
> notice against trespass is given by:
> (I) actual communication to the actor . . . .
> (2) . . . [A]n offense under this subsection constitutes a misdemeanor
> of the third degree if the offender defies an order to leave personally
> communicated to him by the owner of the premises or other
> authorized person.

Pa. C.S. § 3503(b).  The statute, however, also provides an affirmative defense where "the

premises were at the time open to members of the public and the actor complied with all lawful

conditions imposed on access to or remaining in the premises."  18 Pa. C.S. § 3503(c)(2)

(emphasis added).  Police officers are charged with evaluating this affirmative defense when

assessing probable cause if, under the circumstances, they reasonably should have known of the

facts establishing an affirmative defense.  See Estate of Dietrich v. Burrows, 167 F.3d 1007,

1010-12 (6th Cir. 1999) (citing Carroll v. United States, 267 U.S. 132, 162 (1925)) (rejecting

defendants' argument that "police officers cannot be expected to analyze the merits of every

asserted affirmative defense prior to completing an arrest" on the ground that "[t]he law has been

clearly established since at least the Supreme Court's decision in Carroll . . . that probable cause

determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*") (emphasis in original).[6]

In the instant case, Dr. Lischner does not dispute that the essential elements of defiant trespass were satisfied.  Rather, Dr. Lischner contends that, given Officer Kehrle's knowledge of the facts and circumstances at the time of the arrest, a reasonable police officer in his position would have known the "no signs or protesting" condition invoked by Drexelbrook was unlawful and, therefore, that Dr. Lischner was not committing a crime.  In the context of a summary judgment motion, the burden is on Dr. Lischner to "show facts which support the affirmative defense, but also that a reasonable police officer would know of these facts and conclude that defiant trespass had not been committed."  Radich, 886 F.2d at 1396.

To establish the affirmative offense, Dr. Lischner must demonstrate that "the premises were at the time open to members of the public" and that he "complied with all lawful conditions imposed on access to or remaining in the premises."  18 Pa. C.S.A. § 3503(c)(2); Radich, 886 F.2d at 1396.  Here, it is undisputed that the Drexelbrook premises at issue were open to the public at all times, including the evening of Dr. Lischner's arrest.  For example, it appears that

---

[6] Contrary to the Defendants' assertions, Radich, a case of undeniable significance here, does not stand for the general principle that a police officer is *never* obligated to predict the outcome of an affirmative defense – i.e., whether a landowner's condition was unlawful.  Rather, the holding in Radich is limited to its facts; under the *specific circumstances* presented in Radich, the court held that the legality of the condition imposed was not "readily discernible to a police officer making arrests or city official formulating a policy to enforce private trespass rights."  Id. at 1398.  By contrast, for example, in Estate of Dietrich, the Court of Appeals for the Sixth Circuit determined that the arresting officers in that case "had full knowledge of facts and circumstances that conclusively established, at the time of the Dietrichs' arrests, that the plaintiffs were justified – by statute – in carrying concealed weapons during their work.  Estate of Dietrich, 167 F.3d at 1012.  The Court held that "[c]onsequently, none of the defendants had probable cause at the time of the arrests to believe the plaintiffs had violated, were violating, or were about to violate the law."  Id.

the driveway area where these events took place can be used by members of the public as they walk across, onto or from the Drexelbrook complex.  It is also undisputed that Dr. Lischner did *not* comply with the condition imposed upon access for this event.  Finally, it is undisputed that Officer Kehrle knew that Drexelbrook was open to the public, and that signs and protesting on the premises were prohibited on that particular evening.[7]  Thus, the question of probable cause turns on "whether a reasonable police officer, under the facts and circumstances of this case, would know that the condition was unlawful."  Radich, 886 F.2d at 1397.

This question, in turn, depends on whether the "no signs or protesting" condition imposed by Drexelbrook was indeed lawful.  The legality of such a condition is a question of law, Radich 886 F.2d at 1397, and, therefore, properly decided by the Court at the summary judgment stage where, as here, the material facts as to that issue are not in dispute.  For the reasons discussed more fully below, the Court finds that Drexelbrook's "no signs or protesting" policy was unlawful.  However, the probable cause analysis does not end there, because in order to find that Officer Kehrle did not have probable cause to arrest Dr. Lischner, the Court also must find that a reasonable police officer would have known the Drexelbrook policy was unlawful.

Even though Dr. Lischner withdrew his First Amendment claim, one might nonetheless see this dispute as a product of the tension between two fundamental democratic and constitutional values, namely, the rights attendant to ownership of private property and the rights

---

[7] On the evening of the President's appearance, Drexelbrook prohibited signs and protesting upon its property, and communicated this rule to its own security guards and to the Upper Darby Police Department.  The Upper Darby police department, in advance of the event, orally communicated the "no signs or protesting" policy to its officers.  There is no evidence in the record as to whether the restriction was published or otherwise communicated to the public, other than on an immediate, essentially one-on-one basis as actual events unfolded.

of free expression and the right to petition the government.  In the context of this case, that tension would be described as whether the law enforcement arm of the state can be called upon to give voice to the directive of a property owner by arresting a member of the public giving voice to his views on a matter of public policy while standing on the property owner's premises.[8]  We know that among the prices paid in our complicated society is that neither of these values enjoy unfettered expression.  When they butt heads – and when the state is faced with weighing the balance between them – the fineness of the lines that must be drawn is unescapable.

Although the right to possess and use property undeniably and quite properly is one of "the Hallmarks of Western Civilization," Andress v. Zoning Board of Adjustment of Philadelphia, 188 A.2d 709, 713-14 (Pa. 1963), and a dearly valued and protected right in our democracy, see New York Times v. Sullivan, 376 U.S. 254, 270 (1964), this right is not absolute, Euclid v. Ambler Realty Co., 272 U.S. 365, 390-93 (1926); Commonwealth v. Tate, 432 A.2d 1382, 1389 (Pa. 1981).  It is subject to the reasonable and nondiscriminatory exercise of police power and the appropriate accommodation of the right to freedom of expression.  See Tate, 432 A.2d at 1389.  The government may, when necessary, protect personal liberties even when that protection, to a limited extent, subordinates the constitutional interests of others.  Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 575-78 (1977); see also PruneYard Shopping Ctr. v.Robins, 447 U.S. 74, 81 (1980) ("It is, of course, well-established that a state in the exercise of its police powers may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation . . . .").  Nonetheless, the owner

---

[8] It bears emphasis that the events in question do not involve a violation or potential violation of a state or local law – rather, the offending conduct contravened a property owner's rules for a particular event.

of private property is "entitled to fashion reasonable rules to control the mode, opportunity and site for the individual exercise of expressional rights upon his property."  <u>Tate</u>, 432 A.2d at 1390. In evaluating the reasonableness of a condition, courts have focused on the totality of the circumstances, including the nature of the private property, the nature of the condition and the specific circumstances at the time.

In <u>Commonwealth v. Tate</u>, a private college sponsored a community anti-crime symposium, which included a speech by then FBI Director Clarence Kelley.  Both the campus and the symposium were open to the public, and the appellants sought to protest peacefully against Director Kelley and FBI policies in general.  The college required political demonstrators or solicitors to obtain a permit, which the appellants sought and the college denied.  The appellants nevertheless entered the campus to distribute leaflets outside the event, were arrested and, ultimately, were convicted of defiant trespass.  The Pennsylvania Supreme Court reversed the criminal convictions on the grounds that the college had created a public forum by permitting public access to the campus and hosting public events for the benefit of the community.  In particular, at the time the appellants were arrested, the college had provided a public forum for a controversial figure.  The court held that,

> [i]n these circumstances, the college could not, consistent with the
> invaluable rights to freedom of speech, assembly, and petition
> constitutionally guaranteed by this Commonwealth to its citizens,
> exercise its right of property to invoke a standardless permit
> requirement and the state's defiant trespass law to prevent
> appellants from peacefully presenting their point of view to this
> indisputably relevant audience in an area of the college normally
> open to the public

<u>Tate</u>, 432 A.2d at 1390-91.  Following the rationale behind the statutory affirmative defense, the

court adopted a balancing approach, weighing "the college's right to possess and protect its property against appellants' rights of expression in light of the compatibility of that expression with the 'activity of [the] particular place at [the] particular time.'" Id. at 1390 (quoting Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)).  Applying this approach, the Tate court determined that the appellants' peaceful demonstration was entirely compatible with a political event hosted by a college campus that was generally open to the public.

By contrast, in Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Insurance Company, 515 A.2d 1331 (Pa. 1986), where the appellants sought to enjoin a private mall from enforcing its policy of prohibiting all political solicitation, the Pennsylvania Supreme Court held that "the Pennsylvania Constitution does not guarantee access to private property for the exercise of such rights where, as here, the owner *uniformly* and effectively *prohibits all political activities* and similarly precludes the use of its property as a forum for discussion of matters of public controversy."  Id. at 1333 (emphasis added).  In other words, by strictly and uniformly prohibiting political solicitation, a mall may operate as "a market place for the exchange of goods and services but not as a market place for the exchange of ideas."  Id. at 1337.

Federal courts have labored to apply these general principles in addressing the issue of probable cause and the affirmative defenses to defiant trespass.  In Radich, for example, pro-life demonstrators were arrested when they entered a private parking lot to distribute pro-life literature and speak to individuals entering an abortion clinic.  The parking lot was delineated by a line painted on the ground and was marked with a sign stating that the lot was private property and denying protestors permission to enter.  In that case, as here, the arresting police officer

12

asked the demonstrators to leave the property before arresting and charging them with defiant

trespass.  Relying on the statutory affirmative defense and arguing that the "no protesting" policy

was unlawful, the demonstrators sued the police officer and the City of Philadelphia for arrest

without probable cause.

The Court of Appeals did not reach the question of the legality of the "no protesting"

condition imposed by the parking lot owner because it held that "the legality of the condition

imposed is not readily discernable to a police officer making arrests or city official formulating a

policy to enforce private trespass rights.  Radich, 886 F.2d at 1398.  The Court distinguished

Tate, noting that Tate "rested on the premise that the property at issue was a forum either created

for or compatible with expressive activity."  Id. at 1397 (citing Tate, 432 A.2d at 1389).  The

parking lot in question in Radich, emphasized the court, was "dedicated not to expressive

activity, but to the temporary storage of motor vehicles" and such a parking lot "used only for

commercial purposes bears no resemblance to a college campus that has opened its doors to

general debate, or even a shopping mall, where pedestrians assemble and stroll at leisure."  Id.

Under these circumstances, the court refused to impose upon a police officer or city official

authorizing the arrest policy "the duty to correctly predict how a court will answer this

unresolved and complex legal issue."  Id.

Similarly, in United Food and Commerical Workers Union Local 72 v. Borough of

Dunmore, 40 F. Supp. 2d 576 (M.D. Pa. 1999), which concerned the arrest of nonemployee

union workers who knowingly violated a supermarket's "no-solicitation" policy, the court

concluded that "Pennsylvania law is in an uncertain state in relation to defiant trespass based

upon violation of a no solicitation policy."  Accordingly, the court held that "as long as there is

some reasonable basis for believing that a no-solicitation policy is enforceable, a reasonable police officer has probable cause for an arrest for defiant trespass where a union member knowingly violates the no solicitation policy." Id. at 590-91.

Taken together, these cases establish a number of principles governing the lawfulness of conditions prohibiting expressive activity such as that pursued by Dr. Lischner on private property on the occasion of the President's car's arrival at Drexelbrook.  First, the Court must look to whether the specific part of the private property, by its nature or by the purpose for which members of the public are permitted enter, creates a forum for, or is compatible with, expression. See Radich, 886 F.2d 1397.  Second, the Court must evaluate whether the expressive activity at issue is compatible with the particular purpose of the forum at the particular time the expressive activity occurs.  See Tate, 432 A.2d at 1390.  Third, the Court must acknowledge that a content-neutral condition is more likely to be lawful than a content-based condition.  Western Pennsylvania, 515 A.2d at 1333.  Finally, the Court must apply a fact-specific, totality-of-the-circumstances approach that takes all of these factors, as well as the property owner's rights, into consideration.

Applying these principles here, the Court concludes that the condition as imposed by Drexelbrook in this instance was unlawful.[9]  This case concerns a political event in a private residential community that is generally open to the public – a very different scenario than a supermarket's no-solicitation policy, a parking lot owner's no-protesting rule, or a shopping

---

[9] See Clark v. Modern Group, 9 F.3d 321, 326 (3d Cir. 1993) (when state law is unclear, federal courts "must forecast the position the supreme court of the forum would take on the issue").  The Court emphasizes that this case does *not* involve a property owner's effort to invoke the subject condition *inside* the facility where the invitation-only guests gathered.

mall's prohibition on political solicitation.  The purposes for which the property owners invited the public to enter the supermarket or mall were strictly commercial: shopping and, at the mall, also dining and entertainment.  The purpose of public entry onto the clinic parking was even more limited: the temporary storage of vehicles.  In sharp contrast to those locations are the college campus in Tate and the multi-use community in the present matter, where the property owner hosted an elected and political national public figure, and permitted the public onto the exterior property and invited guests into the interior of the property, all in association with that event.

The Defendants here endeavor to make much of the fact that the college landowner in Tate provided a public forum while Drexelbrook hosted a private, invitation-only event for contributors to President Bush's upcoming election efforts, not a public "speech."  The Supreme Court, however, has held that both the solicitation of funds and the act of contributing are expressive activities protected by the First Amendment.  See McConnell v. Federal Election Comm'n, 540 U.S. 93, 135-36 (2003); Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 386 (2000) (The "constitutional guarantee" of the First Amendment "'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'") (quoting Buckley v. Valeo, 424 U.S. 1, 15 (1976)); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632 (1980) (holding that solicitation of financial funding "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues"); Buckley, 424 U.S. at 22 ("Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of

common political goals.").  Although the attendees at the Drexelbrook event had *already* contributed to the President's campaign, the Defendants nonetheless characterize the event as "a private, invitation-only dinner held for the specific purpose of raising money for President Bush's campaign" (Def. Response 14), where President Bush "sought only funds from invited supporters for the specific purpose of winning his election" (Def. Response 15).  Because it was, by the Defendants' own description, organized as part of an effort to win a political campaign, the Drexelbrook event was an inherently political and expressive activity.  The distinction between the public address (a "speech," as defined by the Defendants) or public forum in <u>Tate</u> and the "private fund-raiser" here is less important than the fundamentally political nature of both kinds of events and the intended audience of the expressive activity.  In short, this case does not pose a situation such as if the President had come to attend a truly private event such as, for example, a friend's birthday party.

Moreover, as Officer Kehrle understood it and testified in his deposition, Drexelbrook welcomed members of the public onto the property "to observe the President's motorcade and catch a glimpse of the President."  (Kehrle Dep. 42-43.)  This distinguishes the private event on that day from a private or personal event, such as wedding, where all uninvited members of the public are or could be excluded from the property.  By opening up its property to the public in conjunction with hosting a significant political figure, Drexelbrook created and promoted a public feature to the private event and, in doing so, created a forum compatible with expressive activity.

Second, the quiet and peaceful display of signs or messages was not incompatible with the circumstances of the President's visit to Drexelbrook.  The public was permitted to enter the

16

property; an area was specifically designated for public to view the President's motorcade; and the relevant audience[10] was both members of the public who support the President and the President himself.  There is no evidence in the record that Dr. Lischner in any way caused a disturbance, harassed or bothered other members of the public, or orally vocalized his message in any way.  Indeed, with the exception of the text-laden sign on his chest, the record suggests that Dr. Lischner was virtually indistinguishable from other members of the crowd.  In reality, the record suggests that by virtue of its size, the sign's lengthy message was unreadable from any appreciable distance.

Third, as with the permit requirement in <u>Tate</u>, the condition imposed was arguably content-neutral.[11]  Nonetheless, argues Dr. Lischner, by hosting the President in conjunction with efforts to win a political campaign for public office, Drexelbrook provided a forum to one side of the debate and, therefore, could not exclude the other.  While the Pennsylvania Supreme Court unequivocally declined to require the owners of private property, such as malls, to serve as a

---

[10] The Court rejects the Defendants' argument that the public sidewalks surrounding Drexelbrook, which were designated for protestors and sign-carriers, provided a reasonable alternative for communication of Dr. Lischner's ideas.  As the Pennsylvania Supreme Court noted in <u>Tate</u>, in the absence of time, place and manner restrictions, the refusal of Drexelbrook to permit the peaceful display of signs "cannot be sustained by the argument that [Dr. Lischner] could have reached the same audience elsewhere."  <u>Tate</u>, 432 A.2d at 1391 n.15.

[11] There is a genuine issue of fact here as to whether the Drexelbrook policy excluded only anti-President or anti-President policies protesters or all "protesters," or "advocates," within the broadest meaning of the word.  Accordingly to William Jay, a representative of Drexelbrook Associates, "on September 15, 2003, 'Drexelbrook Associates' did not permit the general public to display signs or otherwise engage in political protest on its aforementioned property."  (Jay Affidavit at ¶ 9.)  Officer Kehrle, however, has testified that he was instructed to remove from the property all persons displaying "any signs," i.e., the instruction was not tied to political message.  (Kehrle Dep. at 14.)  The record is simply silent as to whether any pro-President signs were permitted.

political forum, it explicitly conditioned this holding on the *uniform* application of a ban on political solicitation.  See Western Pennsylvania, 515 A.2d at 1336 (shopping malls not required to provide a political forum so long as the owner "does not grant unfair advantage to particular interests or groups by making his premises arbitrarily available to those he favors while excluding all others").  As discussed above, the political, rather than personal, nature of the event, in conjunction with the admission of the public onto portions of the property, including the portion where Dr. Lischner was located, rendered the President's gathering an expressive activity.  Thus, Drexelbrook's ban on signs or protesting outside the facility at such an event and at such a time when it welcomed non-sign-bearing and non-"protesting" members of the public onto its property falls squarely within the purview of Tate and Western Pennsylvania, both of which prohibit such discrimination.

Although the Court understands and acknowledges Drexelbrook's desire to avoid disruptive protests during the President's visit, under applicable law it cannot sanction the "no signs or protesting" policy under these circumstances.  Here, as in Tate, Dr. Lischner "wished to communicate peacefully and unobtrusively – in an area normally open to the public – to those assembled," and, therefore, "the absolutely fundamental rights of the public to freedom of political speech and petition for redress of grievances were clearly implicated."  See Tate, 432 A.2d at 1390.  Once it opened its doors to the President and others in the context of a hotly contested political campaign and to members of the public, Drexelbrook could not then selectively exclude persons who wished to peacefully "petition for redress" in a most unobtrusive

way – by quietly displaying a small sign.[12]  Accordingly, the Court concludes that the "no signs or protesting" condition imposed by Drexelbrook in these circumstances was unlawful.

In the context of the probable cause issue at hand, the Court next must determine whether a reasonable police officer applying these principles would have known whether Drexelbrook's condition was unlawful.  Relying again on Radich, Officer Kehrle contends that he was not obligated to predict how Pennsylvania courts would decide an affirmative defense raised by Dr. Lischner and that, in any event, Pennsylvania law is not sufficiently clear for a reasonable police officer to discern the lawfulness of a condition.  Dr. Lischner, in turn, contends that under the circumstances presented here, there was no reasonable basis for believing that the Drexelbrook policy was enforceable.

The Court disagrees.  The record established thus far raises a genuine issue as to whether a reasonable police officer should have known Drexelbrook's policy was unlawful.  There is no doubt that the law of criminal defiant trespass and the question of probable cause is very fact-

---

[12] Indeed, it bears emphasizing that Dr. Lischner created no security or sensibilities risk here, either to himself or to others; indeed, Officer Kehrle candidly expressed his own reservations that he was hesitant to arrest him, and went to great lengths to charge him with a lesser offense. Even after Dr. Lischner "repeatedly refused to comply" with Officer Kehrle's request, Officer Kehrle did not immediately arrest him.  (Def. Mem. 3.)  Rather, Officer Kehrle "sought out and consulted with the (then) head of 'Drexelbrook Associates' private security" and did not place Dr. Lischner under arrest until asked by Drexelbrook personnel to remove Dr. Lischner from the property. (Id.; see also Kehrle Dep. at 20 ("I more or less pleaded with [the Drexelbrook representative], you know, it was kind of ridiculous, it was minor.").)  Then, "at the police station, Defendant Kehrle flipped through the crimes code and stated: 'I'm trying to find something that won't be too hard on you.'" (Def. Mem. 3.)  When asked why he charged Dr. Lischner with disorderly conduct, Officer Kehrle testified that "[i]t doesn't make sense to charge a 75-year old man with a Misdemeanor.  I tried to give him a break."  (Kehrle Dep. 35.)

specific.[13]  Here, the record supports a finding by a reasonable jury that, under the instant circumstances, the illegality of the Drexelbrook policy was sufficiently well-established that a reasonable police officer would have known it was unlawful.  However, a jury also could rationally find that, given the facts and circumstances known to Officer Kehrle, there was a reasonable basis for believing the condition was lawful.  Thus, probable cause remains a genuine issue for trial, and the Court declines to hold as a matter of law on this record as presently presented that Officer Kehrle had an insufficient reason to know that such a condition under such circumstances was unlawful.

The Court is fully cognizant of the difficulty facing a police officer in Officer Kehrle's position.  Nonetheless, police officers are entrusted with the significant powers, including the power to arrest, a power that it is specifically limited by the doctrine of probable cause, which is derived directly from the text of the Fourth Amendment.  For this limitation to operate effectively, police officers must know the law.[14]  To adopt the Defendant's argument that

---

[13] This fact-specific nature, however, does not detract from the clarity of its underlying principles.  Under certain circumstances, the unlawfulness of a property owner's condition could be sufficiently apparent for a reasonable police officer to know that an individual has not committed defiant trespass by failing to comply with that condition.

[14] The Defendants' concern that "there will be numerous instances where police officers, through no fault of their own, will not be privy to information essential to the analysis" misunderstands judicial review of the probable cause determination.  That review is dictated by the "facts and circumstances within the arresting officer's knowledge" at the time of arrest.  See Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).  A police officer's probable cause determination will not be evaluated on the basis of facts of which the officer was not aware at the time of arrest.  Rather, the Court holds today only that *if the police officer is aware of the facts and circumstances establishing an affirmative defense to defiant trespass*, he or she should know that a crime is not being committed.  Thus, if a police officer, as in the Defendant's hypothetical, is unaware of "how the property owner holds the property out to the public," "the complete nature of any hosted event," or "whether the property owner somehow encouraged public participation in a newspaper article," his or her probable cause determination

20

Pennsylvania law is unclear in <u>all</u> cases involving "expressive activity on private property that is open to the public" is to misconstrue <u>Radich</u> and jeopardize a most fundamental right.[15]  If the law of defiant trespass in Pennsylvania is so unclear that a police officer need *never* consider whether the condition he or she is enforcing is lawful, then the right to freedom of expression on private property, which was deemed worthy of statutory protection by the Pennsylvania legislature, <u>see</u> 18 Pa. C.S. § 3503(c)(2), has acquired an inexorable and expensive price tag: arrest and detention.

Moreover, if courts never reach the question of whether a property owner's ban on expressive activity is lawful in the context of reviewing probable cause, the law will never achieve any greater clarity, and the affirmative defense – which negates the criminality or

---

will be evaluated without consideration of those facts.  The Court today limits its holding to the facts and circumstances presented here – facts and circumstances which fairly establish Dr. Lischner's affirmative defense and raise a genuine issue as to whether Officer Kehrle should have known that the condition sought to be imposed was unlawful.

[15] The Supreme Court observed that "[A] function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech, though not absolute . . . is . . . protected against censorship or punishment . . . . There is no room under our Constitution for a more restrictive view.  For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."  <u>Cox v. Louisiana</u>, 379 U.S. 536, 551-52 (1965); <u>see also</u> <u>Roth v. United States</u>, 354 U.S. 476, 484 (1957) ("protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people").  Both the Supreme Court of United States and the Supreme Court of Pennsylvania have embraced the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  <u>Tate</u>, 432 A.2d at 1388) (quoting <u>New York Times v. Sullivan</u>, 376 U.S. 254, 270 (1964)).

wrongfulness of the act[16] – will in most cases protect only against conviction, not against the potential inconvenience and stigma of arrest.  Neither Radich nor any other case cited by the Defendants or discovered by the Court commands or condones such a result.

### 2.    Qualified Immunity

Officer Kehrle also invokes the defense of qualified immunity, which shields government officials performing discretionary functions from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Since qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," Blackhawk v. Pennsylvania, 381 F.3d 202, 215 (3d Cir. 2004), a determination that probable cause was lacking does not require a finding that the arresting officer is liable for damages, Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 1999).  As the Supreme Court explained, "it is inevitable that law enforcement officials will mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable."  Anderson v. Creighton, 483 U.S. 635, 641 (1987).[17]

"Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."

---

[16] In Pennsylvania, "an affirmative defense is defined as one where the defendant admits his commission of the act charged, but seeks to justify or excuse it."  Commonwealth v. White, 492 A.2d 32, 35 (Pa. Super. Ct. 1985).

[17] The issue of qualified immunity must be resolved at the earliest possible time because the privilege will be effectively lost if the case is erroneously permitted to go to trial.  Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2001).

Brosseau v. Haugen, 543 U.S. 194, 198 (2004); see also Paff, 204 F.3d at 431 ("A court presented with a claim of qualified immunity must examine both the law that was clearly established at the time of the alleged violation and the facts available to the officer at that time, and must then determine, in light of both, whether a reasonable official could have believed his conduct was unlawful.").  Where qualified immunity is raised as a defense, its availability is "an objective question to be decided by the court as a matter of law."  Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).

The Court first must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show a constitutional violation.  Sherwood v. Muvihill, 113 F.3d 396, 401 (3d Cir. 1997); see also Saucier v. Katz, 533 U.S. 194, 201 (2001) (holding that existence or nonexistence of a constitutional right is the first inquiry).  If the plaintiff cannot show a constitutional violation, the officer is entitled to qualified immunity.

If, however, the plaintiff demonstrates that a constitutional injury occurred, the court must determine whether the constitutional right was "a clearly established one, about which a reasonable person would have known."  McGreevy, 413 F.3d at 364 (quoting Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000)).  "Clearly established" means "some but not precise factual correspondence between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law."  McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001).  The "salient question" is whether the law at the time of the incident gives a defendant "fair warning" that the defendant's conduct was unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259 (1997)).  See also Rivas v. City of Passsaic, 365 F.3d 181, 200 (3d Cir. 2004) (quoting Hope, 536 U.S. at 741) ("[I]n some

cases 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'").

With respect to the initial inquiry, Dr. Lischner has presented sufficient evidence to, at a minimum, raise a genuine issue as to whether a constitutional violation occurred.  Assuming, *arguendo*, the existence of a constitutional violation, the Court must determine whether the constitutional right in question was "clearly established" such that a reasonable law enforcement officer could have believed that his conduct was lawful under the circumstances.  Blackhawk, 381 F.3d at 215.

Mindful that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," Brosseau, 543 U.S. at 198 (quoting Saucier, 533 U.S. at 201), the Court finds that even if Officer Kehrle did not have probable cause to arrest Dr. Lischner, under the circumstances presented here, he is entitled to qualified immunity.  A reasonable person, having received orders from a supervisor in advance, could have concluded that the condition he was enforcing was lawful.  Officer Kehrle's choice to accept orders from his superiors in the Police Department and then reiterated by the property owner was not unreasonable and "suggests neither that he was incompetent nor that he knowingly violated the law."  Paff, 204 F.2d at 437.  Officer Kehrle not only confronted a situation in which probable cause was a very close call; he also had received explicit orders in advance on how to make that call.  Confronted with a clear violation of the policy imposed by Drexelbrook and adopted by the Upper Darby Police Department, it would not necessarily be clear to a reasonable police officer that enforcing the policy was unlawful.  See Brosseau, 543 U.S. at 199 ("The relevant dispositive

24

inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable police officer that his conduct was unlawful in the situation he confronted.").  In other words, even if Officer Kehrle objectively did not have probable cause to arrest, it was objectively reasonable for him in the actual circumstances to accept the judgment of the Upper Darby Police Department.

Thus, the Court finds that Officer Kehrle is protected by the doctrine of qualified immunity with respect to Dr. Lischner's Fourth Amendment claim and may not be held personally liable.  Therefore, the Court will grant summary judgment in favor of Officer Kehrle on all counts and deny Dr. Lischner's Motion for Partial Summary Judgment.

## B.   **Monell Claims Against Upper Darby**

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality is liable for damages under Section 1983 when a policy, practice or custom of the municipality causes a constitutional violation.  Id. at 691.  In order to recover from a municipality under Section 1983, a plaintiff must "(1) identify a policy or custom that deprived him or her of a federally protected right, (2) demonstrate that the municipality, by its deliberate conduct, acted as the 'moving force' behind the alleged deprivation, and (3) establish a direct causal link between the policy or custom and the plaintiff's injury."  Startzell v. City of Philadelphia, No. 05-5287, 2007 WL 172400 (E.D. Pa. Jan. 18, 2007) (citing Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).  Alternatively, a plaintiff may recover under Section 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 387-88 (1989); Brown v. Muhlenberg Twp., 269 F.3d 205, 215 (3d Cir. 2001).

25

A municipal "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a government] body's officers."  Monell, 436 U.S. at 690.  A "policy" within the meaning of Section 1983 "implies a course of action consciously chosen from among various alternatives," Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).  See also Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000) ("Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict.")(citation omitted).  A plaintiff need only demonstrate a likelihood of resultant constitutional violations, *not necessarily a long-standing practice; a single incident of unconstitutional conduct on the part of municipality is sufficient to establish municipal liability under Monell*.  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (holding that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly").

Upon proof of the existence of a policy, practice, or custom, the plaintiff can establish causation by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its obvious consequences."  A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 580 (3d Cir. 2004).  Once the plaintiff has made the necessary showing, and so long as the causal link is "not too tenuous," the question "whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."  A.M., 372 F.3d at 581.

To defeat summary judgment on a "failure to train" theory, a plaintiff "must present evidence that the need for more or different training was so obvious and so likely to lead to the

26

violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." Brown, 269 F.3d at 215.  Although "deliberate indifference" ordinarily may be established "only where the failure has caused a pattern of violations," a pattern of violations is not necessary "where it was obvious that the policy or custom would lead to constitutional violations." Berg, 219 F.3d at 275 (citing Brown, 520 U.S. at 405).

Dr. Lischner alleges that Upper Darby should be held liable for his injuries because (1) on the day of the President's visit at Drexelbrook, Upper Darby had an affirmative policy of supporting the unlawful Drexelbrook approach to the event by instructing its officers to arrest persons displaying signs on the property, notwithstanding the fact that there would be no probable cause to effect such arrests, and/or (2) that Upper Darby failed to train its officers concerning the contours of the law of defiant trespass.

First, it is undisputed that it was the affirmative "policy" of Upper Darby on the day of the President's visit to defer to the property owner's declaration of permissible activity and arrest members of the public holding signs or otherwise "protesting" on Drexelbrook property.  Officer Kehrle testified that, in arresting Dr. Lischner, he was acting pursuant to instructions from the Upper Darby Police Department, specifically that "there were to be no protesters or signs displayed on the private property" and that "if they didn't agree to leave or remove the signs we were supposed to arrest them."  (Kehrle Dep. at 13, 18.)  The Defendants admit that "Sergeant Parsons instructed Defendant Kehrle to enforce the policy of Drexelbrook Associates that demonstrators could not display signs on its property" and that Officer Kehrle "was authorized to arrest demonstrators displaying signs on Drexelbrook who refused to cease displaying signs, after sufficient notice, refused to leave the private property."  (Defendants' Response to Statement of

27

Facts, ¶¶ 9, 10.)  Since the "no signs or protesting" policy was unlawful, a rational trier of fact may find that Upper Darby's policy called for the unlawful arrest of persons not engaged in criminal activity, and, therefore, caused Dr. Lischner's constitutional injury.[18]

Second, the record also may support a finding that Upper Darby's failure to sufficiently train its officers amounts to deliberate indifference on the part of Upper Darby with respect to enforcement of the defiant trespass statute.  Although Officer Kehrle testified that Upper Darby provides annual training that covers changes in Pennsylvania's criminal statutes, he also testified that he has received no training specifically concerning the law governing "defiant trespass" or the meaning of "open to the public" and "lawful condition" as those terms are used in the defiant trespass statute.  (Kehrle Dep. at 48-50.)  Officer Kehrle also testified that Upper Darby had not provided any training concerning the parameters of the right to engage in political expression, which is central to the question of what constitutes a lawful condition under the defiant trespass statute.  (Id. at 46.)  When viewed in a light most favorable to Dr. Lischner, as the Court must view the record at this junction, there is sufficient evidence to create a genuine question of fact as to whether Upper Darby's failure to train its officers amounted to "deliberate indifference" in the face of likely constitutional violations.

## C.   False Arrest and False Imprisonment Claims Against Officer Kehrle

Since Officer Kehrle is entitled to qualified immunity, he cannot be held personally liable

---

[18] The Court recognizes that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . ."  Oklahoma City, 471 U.S. at 823-24.  Here, the record can support a finding both that the incident occurred and that it was caused by an existing, unconstitutional municipal policy of deference to a property owner invoking an unlawful restriction on members of the public.

for any damages arising out of Dr. Lischner's arrest.  Therefore, the Court will enter summary

judgment in favor of Officer Kehrle on these claims as well and deny Dr. Lischner's Motion for

Partial Summary Judgment.

**CONCLUSION**

      For the foregoing reasons, summary judgment in favor of Officer Kehrle is granted on all

counts. Summary judgment is denied with respect to Dr. Lischner's <u>Monell</u> claims against Upper

Darby.  Dr. Lischner's Motion for Partial Summary Judgment is denied.  An appropriate Order

consistent with this Memorandum follows.


                                             BY THE COURT:


                                            <u>S/Gene E.K. Pratter</u>
                                            GENE E.K. PRATTER
                                            UNITED STATES DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HAROLD LISCHNER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **UPPER DARBY TOWNSHIP and** | : | |
| **MICHAEL KEHRLE,** | : | |
| **Defendants** | : | **NO. 05-4546** |

## O R D E R

AND NOW, this 5th day of February, 2007, upon consideration of the Defendants'

Motion for Summary Judgment (Docket No. 11), the Plaintiff's response thereto (Docket No.

13), the Plaintiff's Motion for Partial Summary Judgment (Docket No. 13), the Defendants'

Response thereto (Docket No. 14) and the Plaintiff's Reply (Docket No. 16), it is hereby

ORDERED that the Defendants' Motion is GRANTED IN PART and DENIED IN PART, and

the Plaintiff's Motion is DENIED, as follows:

1.  Defendants' Motion (Docket No. 11) is GRANTED as to Officer Michael Kehrle with

respect to all counts in the Complaint;

2. Defendants' Motion for Summary Judgment is DENIED as to the claims against Upper

Darby Township;

3. Plaintiff's Motion (Docket No. 13) is DENIED;

4. Plaintiff's First Amendment and Invasion of Privacy claims are DISMISSED; and

5. Plaintiff's claims brought pursuant to Article I, §§ 1, 7 and 8 of the Pennsylvania

Constitution are DISMISSED.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE
